LOREN M. LAMBERT, No. 5101
Arrow Legal Solutions Group, PC
Attorney for Plaintiff
266 East 7200 South
Midvale, Utah 84047
Telephone (801) 568-0041
llambert@arrowlegalsolutions.com

_____

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

_____

JENNIFER BANNICK,                          :          **COMPLAINT AND
                                                      JURY REQUEST**

    Plaintiff,

vs.                                                   Case No.
                                           :
KENNECOTT UTAH COPPER MINE, LLC                       Judge
dba KENNECOTT UTAH COPPER, LLC,
RIO TINTO, CAL HOSKINS, BRUCE
WOODS, JON PAUL MCFARLAND, SETH
REEVES and MORGAN COSTELLO,
                                           :
    Defendants.

_____

Plaintiff alleges as follows:

## STATEMENT OF JURISDICTION

    1. At the times that this cause of action arose, all parties were residents of Salt

Lake County or were licensed and doing business in Salt Lake County, Utah.

2. Plaintiff initially filed her complaint in this matter with the Utah Labor Commission/EEOC and the EEOC issued her a Notice of Right to Sue.  She received that Notice of Right to Sue, dated April 12, 2013, and therefore had to file this action within ninety days of receiving the Notice of Right to Sue.

3.  Given that this claim is filed within the 90 days and is regulated by Title VII of the federal law jurisdiction is appropriate here in the Utah Federal District Court.

## FACTUAL ALLEGATIONS

### I. GENERAL BACKGROUND INFORMATION

4. On July 24, 2006, Jennifer Bannick, was hired by Kennecott Utah Copper LLC to perform the duties of haul truck driver with the title of  "Operator C." The duties of this position were as haul truck driver who may or may not have other duties according to training. The shifts are twelve hours long, with four days on shift followed by four days off, and rotating from day shift to night shift every two work weeks.

5.  At Kennecott, there are four truck haul teams with schedules that rotate so that the mine is continuously worked every day and night of the year.

6. At the start of each shift, workers meet in, "The Ready Room," for a short safety meeting and a truck assignment that is written on the board.

2

7. Drivers normally have the same trucks, known as listed trucks, assigned to them. If their truck is out of service or in the shop for maintenance, another truck will be assigned or the driver will be given other duties on the ground for the day or until another truck becomes available, depending on the discretion of the truck supervisor.

8. There are several points in the mine that are designated as parking areas for drivers at the end of the shift.  When the shift ends, the trucks will usually be "locked" to their last shovel, and this information is used by the next team coming out on shift in order to locate their trucks in the mine. Being locked to another drive or shovel means your computer will send you to a specific "shovel" during an entire shift. A "shovel" is a loader that transfers ore or waste rock into a haul truck.

9. Every truck is equipped with a radio with several channels which can be used to speak to or hear everyone over the mine operations' channel or other channels such as water service or drill and blast.  These radios can answer private calls from hand-held radios but they cannot be used to call individual radios. Hand-held radios are employed by supervisors and sometimes road and dump personnel, enabling them to make private calls to individual trucks.

10. Trucks have an onboard computer system which gives shovel and dump assignments it can also be used to type messages to production control, record statistics

such as load and haul times and must be used to enter in codes whenever the truck is not moving for such things as personal breaks, delays for truck inspections and lunches, etc. The onboard computers also have a GPS system enabling production control to locate trucks in the mine and pinpoint time and the location.

11. There are several shovels and loaders located throughout the mine and a driver's typical day after the morning safety meeting would be to locate his/her truck assignment on the board, get onto his/her designated bus and upon arrival at his/her truck, perform a safety inspection of his/her equipment and fill out the safety inspection sheet for his/her truck, log his/her employee number into the computer on his/her truck and indicate the truck is ready for duty.

12. The computer will then send the truck to a shovel, a dump, or the crusher, depending on whether the truck is empty or loaded with waste or ore. As each assignment is completed, the computer will send the truck randomly to shovel throughout the mine depending on need or location. This process is repeated throughout the day until the end of the shift.

13. There are several types of equipment that are operated in the mine. The biggest haulage truck, at the time of Ms. Bannick's termination, was the 930 E Komatsu, capable of carrying and dumping loads of approximately 400 tons. The Caterpillar haul

4

trucks are significantly smaller, with a load capacity of approximately 270 - 320 tons depending on the model of truck.

14. Komatsu and Caterpillar haul trucks have different braking systems – Cat trucks do not slide as easily as Komatsus, therefore, sections of the mine are commonly closed to Komatsus while open to Cat trucks. During severe weather conditions roads are frequently closed for all haul trucks while light vehicles are allowed access.

15. In safety meetings, drivers are told that they are the experts on their equipment and that they are expected as part of their jobs to stop equipment and close any roads that they deem to be unsafe. If a driver fails to use good judgment, he/she risks his/her own life as well as the lives of his/her coworkers and is held responsible for any equipment damage occurring as the result of his/her negligent decision to continue running his/her equipment in adverse weather conditions. All of the drivers, and most mine personnel, are aware of this information. This fact is critical to comprehend the events surrounding Jennifer's claims.

## II. RELATIONSHIP WITH DAN DORAN.

16. During Jennifer's first year of her employment with Kennecott, blast foreman Dan Doran initiated a relationship with Jennifer. Dan was the Team Four Foreman at the time and Jennifer was on Team One. As their relationship progressed, Dan asked Jennifer

to apply for a team change from Team One to Team Three.  Dan instructed Jennifer to list

that the reason for the requested team change was so that she could participate in a car

pool.  Dan indicated that he wanted Jennifer and him to have the same days off.   While

Jennifer was of a similar opinion, she did not want to change teams because she was very

comfortable with and fond of her coworkers on Team One.   In spite of this, in the spring

of 2007, Jennifer relented and requested the change.

17. After doing so, while working, Mine Superintendent, Curtis Hargrove called

Jennifer privately on her truck radio and instructed her to pull her truck over and put in a

"delay" on the computer to speak with a supervisor. Jennifer complied and exited her

truck. Mr. Hargrove and Mine Superintendents, Don Mallet, approached.

18. Mr. Hargrove questioned Jennifer about her requested team change and about

her relationship with Dan Doran.  Jennifer told Curtis Hargrove she declined to discuss

her personal relationships.  Curtis Hargrove and Don Mallet then informed her that they,

and Mine Manager, Morgan Costello, were aware of the relationship.

19. Mine Superintendents, Curtis Hargrove and Don Mallet, however, did not

approach Dan and confront him in a similar manner.

20. Jennifer asked how the conversation pertained to her team change request.

Curtis Hargrove asked Jennifer if she could guarantee that her relationship would not

cause her to litigate against Kennecott.  Jennifer assured them that her relationship and team change request would not affect her employment.

21. Jennifer informed Dan about this informal meeting.  Dan indicated that he had informed them about their relationship.

22. Although Jennifer herself had never discussed her relationship with Dan to anyone, it became widely discussed topic throughout the mine.

23.  Soon thereafter, Dan informed Jennifer that he had been summoned by management to a meeting to discuss Jennifer's team change request (Jennifer was not invited to this meeting).  Dan asked Jennifer to purchase a digital recorder for him to take to the meeting because, he explained, he believed that the management would be untruthful about what took place in the meeting.

24.  A digital tape recording of the meeting revealed that Morgan Costello explained to Dan that he felt Jennifer and Dan's relationship equated to nepotism and could cause problems for the mine. Dan responded by pointing out that there was hardly anyone on any of the teams that was not related in some way to someone else; husbands and wives, fathers and sons, cousins, nephews, etc.  Dan specifically mentioned many people by name with whom Jennifer was not acquainted with and pointed out their relationships.  Dan suggested that Jennifer be transferred to another position so that any

7

concerns over nepotism would be neutralized. Mr. Costello objected, saying that Jennifer

would not be promoted and that she would never go anywhere in the company.  Dan

opined that Mr. Costello was acting in a discriminatory manner.  No decision was made

during this meeting.

25.  After the meeting, several weeks passed without a decision on Jennifer's shift

change.  Due to a pending annual family reunion requiring Jennifer to know her schedule,

she called Morgan Costello and discussed the situation with him. Morgan indicated that

he was worried that Jennifer would be under the direct supervision of Dan.

26. However, the proposed team change would actually alleviate that situation

because as it stood, Dan was her supervisor without the team change whenever she

worked overtime.  On Team Three, Jennifer would never be under Dan's supervision.

Morgan expressed his concerns over what would happen in the event of a break up and

Jennifer told him that they would act like adults.  After this conversation Jennifer

received word that the team change request had been approved.

27. Jennifer's relationship with Dan only lasted a few months after the team

change.  Dan admitted to Jennifer that he and Cal Hoskins, the Team Three Supervisor at

the time, were using cocaine and he had been doing so throughout their relationship while

8

she was working on Team One.  Because of this and other behavior that was incongruent with their relationship, Jennifer terminated her relationship with Dan.

## III.  SEXUAL HARASSMENT FROM BRUCE WOODS:

28. Beginning in the fall of 2008, Kennecott employee, Bruce Woods, acting in the capacity of Shovel Foreman, began to call Jennifer every week or so on her haul truck radio private line while she was driving her truck during her shift to ask her out, often suggesting they go bowling.  He would do this when Jennifer had to use her mine radio.

29.  Mr. Woods was in a relationship, but explained to her that he was currently separated from  his girlfriend but they were still living in the same house due to financial concerns.  Bruce obtained Jennifer's phone number by telling her that a group from work including Truck Foreman, Garin Harada and Rerate Ronny Giles (immediate Supervisors) were going horseback riding and that she should come along.  Bruce said that he had gotten into a fight with his girlfriend because she thought he had shown interest in Jennifer at the company party.  Jennifer told Bruce politely but firmly that she was not interested in going out with him regardless of his situation and advised him to make up with his girlfriend.  Jennifer revealed to several of her coworkers that Bruce had been persistently contacting her. They laughed about his behavior.

30.  Despite the fact that she had explicitly informed him that she was not interested, Bruce started to send Jennifer text messages complimenting her on her appearance, parts of her body and texts telling her how sexy he found her.  Bruce asked questions about where Jennifer lived and Jennifer told him, "in Riverton" but Bruce was never given Jennifer's address.  He then sent Jennifer a text message indicating that he had gone by her house and she hadn't been at home, he had done this twice.

31.  This behavior made Jennifer feel extremely uncomfortable.  She nevertheless, remained polite with him because he was her supervisor's best friend.  Jennifer also explicitly told him she did not want to date anyone else from work ever again.   In response, he insisted that he wasn't a jerk like other guys and that he would treat her right.

32. Because of Bruce's behavior, Jennifer discontinued going out to breakfast with coworkers and Bruce on the last Friday of the night shift which was customary.   Instead, she stayed out of The Ready Room and office and hurried to her car so as to avoid having contact with him.  Jennifer also stayed off the mine radio as much as possible so that when she didn't have a listed truck, Bruce would not know what truck she was on and would not call her on the private line.

33. Jennifer's immediate supervisor at the time, Garin Harada was aware of Bruce's interest in Jennifer. On one occasion, Garin directed Jennifer to put stakes up for

10

the 61 shovel with Bruce Woods when her truck was down. This was an odd assignment because it was a complete deviation from a driver's duties and did not require two people. It therefore appeared that Garin and/or Bruce made this arrangement to facilitate Bruce's contact with her.

34. Also, on several occasions, Garin would call Jennifer on her private line while she was working to laugh and tease Jennifer about Bruce Woods being her "stalker."

35. Garin invited Jennifer to come to his Christmas party. At first she declined because she did not want to have contact with Bruce Woods. However, he persisted in urging her to come, she agreed to and asked what she should bring to the party. Garin responded, "Bruce Woods!" and began laughing. On another occasion, Garin instructed Jennifer to drive Bruce home from work. She did not want to, but felt she could not refuse the request of her foreman.

36. During this period of time, Bruce Woods again approached Jennifer and asked her to come on a date with him. At the same time, in a bid to obtain her acquiescence, Bruce Woods suggested he could have Jennifer trained in the shovel department. This would have come with an increase in pay. Jennifer turned him down because she did not want to engage in a quid pro quo relationship with him by going on a date.

37. In the later part of 2008 or around the beginning of 2009, during work, Bruce Woods, after having communicated he would meet her at a haul truck fueling station, requested that she should train him in a haul truck. Jennifer drove her usual shift while he chatted and allegedly observed her doing her job so that he could learn. She then drove him back to his vehicle and before exiting, tried to kiss her. She put her hands up in alarm and screamed. He hurriedly exited. Jennifer then continued to work. He later apologized on the haul truck radio.

38. Within a month or more of this incident, Bruce Woods, in violation of Kennecott's Cardinal Rules, climbed aboard Jennifer's parked haul truck when she was on a personal break on night shift. She yelled at him to get off of her truck. He hastily complied.

39. Following this event, due to Truck Foreman Garin Harada's insinuations that Jennifer should date Bruce, she told him that she would never go out with Bruce Woods and that she was sick of his attention.

40. Shortly thereafter, Garin Harada stated in her quarterly review that she needed, "to demonstrate through her actions that management is not out to get her." Based on the tone and context Jennifer properly interpreted this as she needed to stop complaining and accept the sexual harassment and thereby show her loyalty to management.

41.  Because of all of these incidences in the Spring of 2009, Jennifer reported Mr. Woods' behavior towards her to Cal Hoskins, the team leader who would later be the person who terminated her employment with Kennecott.  Jennifer recorded this conversation. Cal Hoskins states on tape that the behavior of Bruce Woods was inappropriate and that he would look into the situation and meet with Jennifer again regarding the issue.  Cal Hoskins did not meet with Jennifer regarding her concerns and did not inform his supervisor of the concerns Jennifer brought to him as required by Kennecott policies.

42. After Jennifer spoke to Cal Hoskins, Bruce Woods stopped calling her for a period of time. During this period of time, about two to three months, when Jennifer's truck broke down she was given, despite the availability of other options, uncomfortable and shoddy equipment (worn and broken upholstery, faulty heat and air, obnoxiously foul smelling and inefficient weak engine power, etc.) to drive and was excluded from training on the shovels, road and dumps and water service.

43. Then Mr. Woods resumed calling her.  When this occurred, if she saw Bruce's incoming calling sign, Jennifer would not pick up the radio.   On one occasion, she failed to notice this and answered Bruce's call. She informed him that they were not buddies, and that she was angry with him because of how uncomfortable he made her feel at work

and because she knew she was put on poor equipment and did not receive training despite her seniority and abilities because she had slighted him.

44. Bruce continued to have Jennifer locked to his shovel without her knowledge or permission. Jennifer typed a message to production control asking why she was locked to Bruce's shovel ("ask Bruce" was the reply from Colin Roberts, Production Control) and to please unlock her.

45. Around this same time, Jennifer's truck was down. When this happens, it is the truck foreman, Seth Reeves' duty to pick up the driver for re-assignment to another truck. Instead, Bruce Woods came to pick her up. Jennifer was visibly upset and Woods asked her what was wrong. Jennifer told Bruce she was angry with him, wanted nothing to do with him, he was not to call her on the private radio ever again, and that she thought his behavior was inappropriate.

46. Soon thereafter, on a haul truck parking line, Jennifer complained to Seth that she believed she was not receiving the training she requested because of her refusal to date Bruce Woods and her report of Bruce's behavior toward her to Cal Hoskins.

**IV. RETALIATORY HOSTILE WORK ENVIRONMENT.**

47. Sometime in the fall of 2009, Jennifer was sitting in the "The Ready Room" where she was with her crew during a safety meeting. Cal Hoskins was leading the

14

meeting and out of the blue unconnected with anything he was saying, yelled Jennifer's name at the top of his voice. After several seconds of awkward silence he resumed and concluded the safety meeting. Jennifer went to work.

48. The next day, Jennifer was at the "The Ready Room," entrance. Ronny Giles told Jennifer to come into Cal's office.  She complied.  While there, Cal started, in an extremely loud and rapid voice yelling something about Jennifer not being inside the ready room, about her having "issues" (but never elaborated on what the issues were), and about him wanting to require her to sit next to him during safety meetings.  He continuously repeated himself over and over again in an extremely loud and angry manner. Because she felt she was being unfairly treated and feeling humiliated, she stood up to leave. Cal then bellowed "Insubordination!" Jennifer sat back down. Cal continued yelling, repeating himself over and over on the same subject. When he finished Jennifer asked permission leave. Cal granted her request.

49. Jennifer went to the back of The Ready Room to wait for transportation to the bus.  After a few minutes Cal came out of his office with another foreman, Dan Beck. He saw Jennifer and approached her, coming within two feet of her face and leaning over her. In a loud voice he again started yelling. He was so close he was spraying her with spit.  Cal repeatedly yelled, "Are you fit for duty?" to which Jennifer replied "why

wouldn't I be" and "yes" while trying not to cry in public because there were several

people were in back of The Ready Room.  Finally, Ron Black (Union Steward at

Kennecott) approached Cal and yelled back at him, "she said she's fit for duty!"  The two

glared at each other for a moment and walked back into Cal's office.

50. Later Ron told Jennifer that she did not have to tolerate such behavior and that

if Cal repeated the abuse she should call the Speak Out Hotline.

**V. DANGEROUS WINTER ROAD CONDITION INCIDENT– SEXUAL
DISCRIMINATION, SEXUALLY HOSTILE WORK ENVIRONMENT,
RETALIATION.**

51. On January 20, 2010, Jennifer went to work for her scheduled last day working

the night shift.  The operators met in the training facility for Terry Mason's retirement

pizza dinner and pre-shift safety meeting.  At the close of the meeting, Carl Justevsen, a

loader operator and union representative, and Cal Hoskins got into a loud, heated

argument regarding restroom facilities at the bottom of the mine.  Ed Park had to

intervene between the two of them.

52. Due to adverse weather conditions at the mine on the night of January 20/21st,

2010, that caused unsafe, icy and slick road conditions, areas of the mine were shut down

throughout the night by equipment operators unable to run equipment.

53. At approximately 12 midnight, Cal Hoskins called Ron Carter and Randy McGuire (haul truck operators) respectively on the public mine radio and requested that they run their trucks.  In response, due to the slick road conditions, both declined to operate their trucks. Neither Cal Hoskins nor any other mine personnel ever raised any issues or took exception to their refusal run their trucks.

54. Around 1:00 a.m., Jennifer drove a 462 Komatsu haul truck into the Q cut area of the mine and took a load of waste material from the 56 Shovel and started driving up the "10 Percent," or main road to the dump.  Her truck slid down the short ramp leading out of the shovel area and then continued to slide around a flat area before going up the hill.  When the 462 haul truck reached the crusher area, Production control called for loaded haul trucks to run the 10 percent below the crusher and the upper 10 percent was closed.

55. Still in her 462 Komatsu haul truck, Jennifer circled round the crusher area and headed down the 10 percent behind Alan Faucet who was in the 472 haul truck.  Alan's truck began sliding on the ice in front of Jennifer. She also began to slide behind him. As Alan started down the road to the 51 shovel, he got on the mine radio and shut down the bottom of the mine from the crusher level down.

17

56. At this point, because of the road conditions and the requirement that she take consideration for her safety and that of the other employees, Jennifer veered her 462 Komatsu haul truck off onto the flat area of the Q cut between the 61 and 53 shovels and parked it.  Jennifer then entered in a "weather delay" - along with all the other drivers in the bottom of the pit. A work stoppage for the hazardous conditions is referred to as a "weather delay."

57. While waiting on a weather delay in the Q cut, Jennifer received a call on the private line of her truck and answered the call.  It was Bruce Woods.  There was static over the radio and it was hard for her to hear.  Bruce Woods directed Jennifer to move her truck.  Jennifer told Bruce the road was closed and told him to use the mine radio because she had previously told him never to call her on the private line. She hung up.

58. Immediately after hanging up, Jennifer typed a message to Colin Roberts of production control,  that the graders hadn't gotten to her yet and she would go when they got there and to please tell Bruce not to call her.  As Jennifer sent the message, her radio beeped and she answered the line.

59. This time it was Cal Hoskins. Cal, in an agitated and loud voice started yelling at her. Cal wanted to know why she hadn't gone when Bruce told her to go.  Jennifer informed Cal the road was closed and she had been sliding around even on the flat. In

18

contravention to mine safety rules giving a truck driver an absolute right to decline to drive in hazardous conditions, Cal ordered Jennifer to get moving. Jennifer explained to Cal that the road was unsafe.

60. Cal then drove his pickup truck down to where Jennifer was parked. When Cal arrived he pulled alongside Jennifer. Cal, on his radio, insisted that there was nothing wrong with the road and that Jennifer should "get in his pickup" to check out the road. Jennifer informed Cal that his ability to operate his white pickup to determine road conditions for a haul truck was not a measure of the road's safety.

61.  At the time, Cal was not qualified to drive any form of haul truck and was unqualified to make an assessment and thereby countermand the decision of a truck driver.  Jennifer offered to take Cal for a ride in her Komatsu so that he could see how she was sliding. Cal cut Jennifer off when she attempted to speak and yelled in a very loud and alarming voice for her to, "get in [his] pickup."

62. At this point, both because of the conditions of the road which could not be evaluated in a pickup truck and to preserve her emotional and physical well-being because Cal was being physically belligerent towards her because she was a female, Jennifer declined to join Cal in his vehicle.   As a remedy to the problem, Jennifer informed Cal she would call for Ron Black to mediate between them.

63. Jennifer then activated the channels on her radio. First, she went to the mine operations channel and asked why she was the only one being required by Cal to move. Then she flipped over to the drill and blast channel and called for Ron Black. Simultaneously, Cal Hoskins also flipped to the drill and blast channel and also began to call for Ron Black.

64. After speaking with Ron on the radio, Ron told Jennifer he would come to her haul truck. When Ron arrived he requested that Jennifer come meet with him and Cal. However Jennifer, pursuant to her rights under the collective bargaining agreement with Kennecott and her federal labor relations rights, asked Ron to come aboard her haul truck so that she could speak to him without Cal Hoskins present.

65. Ron and Jennifer spoke privately in her truck cab for a few minutes about the conditions of her work and what had transpired as explained above. At this same time, the road remained closed, although some Cat trucks around the area had moved. After this discussion, Jennifer exited her truck, put a wheel chock under her tire, and joined Ron Black next to Cal Hoskins' pickup. Seth Reeves had also driven to the area in his pickup truck and was parked next to Cal Hoskins. He joined Jennifer, Ron and Cal.

66. As soon as Jennifer walked up to Cal, he stepped to within several inches of her face and in a loud voice demanded to know why Jennifer did not move when Bruce

told her to move her truck.  Jennifer explained that, due to the continual sexual-harassment by Bruce against her that Cal was aware of, she did not communicate on her private line with Bruce.  Cal loudly denied  knowing anything about it. Jennifer reminded him of the meeting they had when she had complained about Bruce and that she did not want him speaking with her on her private line.  Cal yelled that he had never heard about it before and knew nothing about it and Ron interjected that everyone on the hill knew about it.  Cal again yelled that he knew nothing about it and then Jennifer said "good thing I recorded it then."

67. Cal then told Jennifer that she was suspended for insubordination and refusal to perform a reasonable work assignment.  Jennifer said she hadn't refused a work assignment, then offered to get back in her truck and drive regardless of weather conditions that gave her an absolute right to decline to drive when she felt it was unsafe, but Cal refused the offer and told Ron Black to take her to The Ready Room.

68. Ron Black then drove with Jennifer to The Ready Room. Upon arriving he exited and left her sitting in his pickup for several minutes.  At approximately 3:00 a.m. Ron Black returned. He informed Jennifer that she would have to take a drug test before she left the mine.  When Jennifer asked why she would have to take a drug test, Ron Black said that Cal had ordered it because of her "emotional state."

21

69. Jennifer complied with the order and submitted a sample for the urine test which came back negative for drugs or alcohol.   This was done in a designated room of the First Aid Shack. Seth Reeves and Ron Black were present for the testing and upon hearing the results, Jennifer asked if Cal Hoskins would join her for a drug test for his emotional state.

70. Seth Reeves requested Cal to come to the first aid shack and join Jennifer for a drug test.  Cal said he would come to the shack but that he wouldn't take a drug test.  Ron Black then drove Jennifer back to her personal vehicle. On the way he mentioned to Jennifer that he thought Cal would not pass a drug test.

71. Before leaving the mine, Jennifer wrote a hurried statement about the events of the day and asked Ron Black when she could return to work.  He said she would be called.  Jennifer left the mine after 4 a.m. on the 21st of January, 2010. As she departed the mine, the trucks were still on weather delays.

72. Jennifer drove home and called the Speak Out Hotline to report what had happened at the mine and also mentioned that she was aware that according to Dan Doran, her former fiancé, Cal Hoskins abused cocaine.

73. Interestingly, according to Wayne Holland, eight people in addition to Jennifer called the Speak Out Hotline the same day and, by the end of the week, nearly forty

22

people had called the Speak Out Hotline about the events that took place on the nights of the 20/21st of January. These persons reported that the crusher was operating and that Cal Hoskins and Bruce Woods, in violation of MSHA policies and even despite the fact that the bottom of the mine had not been reopened for haul truck traffic, were dumping trucks with waste loads and loading them with ore in order to up production.

74. Numerous drivers were upset about the situation, however, although other drivers had refused to move their trucks, Jennifer was the only driver ordered to drive, then berated for declining to drive, asked to give a drug test because she was declining to drive, and then was suspended because she declined to drive in the adverse weather conditions that jeopardized her and others' safety.

## VI. EVENTS AFTER DANGEROUS WINTER ROAD CONDITION INCIDENT - CONTINUATION OF SEXUAL HARASSMENT, SEXUAL DISCRIMINATION.

75. Due to the large volume of calls to the Speak Out Hotline, during the week after Jennifer's suspension a meeting was held for all the truck teams. At this meeting the drivers were assured that they would not be forced to drive their trucks in adverse weather conditions. Also, the proper procedures for operating equipment and closing roads during bad weather situations were reviewed. Jennifer was on suspension and could not attend.

76. On about January 24, 2013, Jennifer was invited to a fact gathering meeting with Morgan Costello (Mine Manager), Ed Park (Mine Superintendent), Jon Paul McFarland (Human Resources) and Ron Black regarding her suspension. She was told to bring a copy of the recording she made of the meeting she had attended with Cal Hoskins. She was further told she was not suspended, just being held out of service while facts were gathered.

77.  On January 25, 2010 this meeting took place. While there, Jennifer related the events of January 20/21, 2010, described Cal Hoskins' discriminatory confrontation with her, described Bruce Woods' harassment of her and her report of it to Cal Hoskins.  She gave a copy of the recording she made of the meeting on a CD to Morgan Costello (Mine Manager at the time)..

78. At the meeting, Morgan Costello discussed Jennifer's past relationship with blast Foreman Dan Doran. Jennifer inquired of Mr. Costello if he had requested the two mine superintendent to question her about her relationship with Dan Doran.  At this point, Morgan became angry. When the meeting concluded shortly afterward he told  Jennifer she was being held out of service until further notice.

79. Jennifer was held out of service until February 2, 2010.

80.  When she returned Jennifer met with Morgan Costello, Seth Reeves, Ed Park and Ron Black in a conference room.  Morgan Costello gave her a notice of suspension for insubordination because she had allegedly refused to comply with a reasonable work assignment. Jennifer informed Ron Black and Morgan Costello that the suspension was unjust and was retaliatory and was motivated by sexual discrimination and that she therefore intended to grieve the suspension. At which point Morgan made the retaliatory statement to Jennifer that, "this could stop right now or get uglier."   Despite this threat to retaliate against her, Jennifer then reiterated that she would grieve the suspension.

## VII. FEBRUARY 10, 2010 MEETING – SEXUAL DISCRIMINATION AND RETALIATORY WRONGFUL TERMINATION.

81. On February 10th, 2010, Jennifer was in The Ready Room at the start of shift attending a pre-shift safety meeting. At that time Seth Reeves told Jennifer to follow him to a conference room.  She did so.

82. In the room Morgan Costello, Ed Park and Ron Black were waiting.  Morgan said that he wanted to know if Jennifer had any problems with any of the supervisors. Jennifer said she did and began talking about what had happened with Cal Hoskins and Bruce Woods and her recent suspension.  Morgan interrupted and said he didn't want to talk about that.  He asked Jennifer if there were any other supervisors she had an issue

with.  Jennifer told Morgan she didn't like being pulled off her truck by Curtis Hargrove

and interrogated about her private life that was no one's business and being accused of

wanting to sue the company for no apparent reason. Morgan didn't want to talk about that

either and continued to speak in circles and ask her about other supervisors.

83. Jennifer and Ron listened to Morgan talk in circles for approximately forty

minutes. Apparently, Jennifer was unable to guess and articulate what he wanted to hear.

Morgan finally changed the subject to discuss the recording of conversations.  He told

Jennifer she was never to do that again and tried to make her promise not to record

anything in the future.  Jennifer asked how she could ensure the accuracy of work

conversations after what Cal Hoskins had done.  Morgan suggested she take notes.

84. Morgan then asked Jennifer if she was recording the conversation. Jennifer

asked Morgan what difference it would make.  Morgan stated he would hold Jennifer out

of service. Jennifer responded she would to take notes from then on.  Morgan then, in a

somewhat squeaky and high-pitched voice and with a grin on his face told her that her

promise came too late and ordered her to go home.

85. Jennifer drove home and told her father what had happened.  He was very

upset and told her that he had gone (without Jennifer's knowledge) and complained to Jon

Paul McFarland and other bosses about Dan Doran and Cal Hoskins and their cocaine use.

86. On about February 17, Morgan Costello invited Jennifer to attend a "Termination Hearing" to be held on February 19, 2010.

87. On February 19, 2010 Jennifer attended her termination hearing. At the meeting's commencement, Morgan Costello told her that they were not discussing the 20/21st of January, 2010 night-shift events. After this, Jennifer apologized to Morgan, saying she had not intended to be insubordinate to him and she was sorry that he took it that way. She stated her job meant everything to her and that she was nervous and scared.

88. In attendance were union members' Ron Black, Tony Cisneros and Carl Justevsen, as well as Jon Paul McFarland, Morgan Costello and Ed Park. The Union members all stated that Jennifer was an exemplary employee who worked a lot of overtime, had a spotless safety record and made money for the company. They further stated said that she had never had any issues up to that time and should not be terminated. The meeting was then adjourned.

89. On February 22, 2010 at about 5 PM Morgan Costello called Jennifer and told her that her employment at Kennecott was terminated.

27

90. On February 23rd, 2010, Jennifer Bannick filed a complaint and intake questionnaire with the Labor Commission. They are attached as Exhibit A. The information stated therein is incorporated herein by reference.

91. On August 17, 2010, Mr. McFarland told Jennifer that the "termination hearing" had been her grievance hearing for her suspension.

## CAUSES OF ACTION

Sex Discrimination, Retaliation and Hostile Work Environment/Sexual Harassment-Defendants

92.  The individual defendants are sued in their representative or official capacity. If however the corporate defendant, Kennecott, claims that any of the individual defendants acted outside of their official capacity and are personally liable to Plaintiff, then such individuals are sued in their individual capacity.

93.  Plaintiff asserts that she was sexually harassed by Bruce Woods, that she complained about him. Defendants specifically knew or should have known about this behavior. Nevertheless this pervasive and outrageous behavior continued and interfered with her work. Defendants failed to take any action thereon but in fact retaliated against Plaintiff because of her complaints and because she was a female by all those actions noted above and by:

28

● excluding her from training,

● giving her unfavorable evaluations,

● subjecting her to belligerent, rude, and hostile communications,

● treating her differently than the male employees in her work assignments,

● ordering her to violate safety policies that men were allowed to follow,

● inappropriately disciplining her for declining to violate safety policies,

● inappropriately disciplining her for engaging in the protected activity of preserving evidence of sexual harassment, a hostile work environment, and of sexual discrimination,

● terminating her because she was a woman and because she had engaged in protected activities by complaining about Bruce Woods' sexual harassment of her, had followed safety policies as woman and by gathering information thereon.

### Proviso

94.    This Complaint was not drafted by plaintiff, but was drafted by her attorney after speaking with plaintiff, reviewing all of the evidence that plaintiff was able to obtain from the defendants' possession, attending the hearings in the industrial commission and taking depositions.  Although plaintiff and her counsel are confident that the core allegations of her complaint are valid, the exact details on what occurred to plaintiff and

who specifically caused plaintiff harm may vary from the alleged facts once information is exchanged through the mandatory court discovery process. In conclusion, this Complaint is not plaintiff's statement; it is a compilation of information regarding what plaintiff believes, to the best of her and her counsel's knowledge and information regarding what the facts will show. The complaint should be read as a whole with all allegations linked to each other and the amounts pled herein are not to be meant to limit the jury's discretion to award more or less damages based upon the facts of this case alone.

### **JURY REQUEST**

Plaintiff requests a jury trial in this action.

WHEREFORE the plaintiff requests:

(1).    That defendants be found to have committed all the torts indicated above,

(2).    That the defendants pay their proportionate share of general damages, special damages, if any, punitive damages, attorney's fees and costs.

(3).    Defendants pay whatever other equitable relief is granted by the court.

(4).    That plaintiff be awarded at least $500,000 in general damages, $1,500,000 in punitive damages and any other monetary damages that arose from the causes of action as noted above.

(5).    Plaintiff be reinstated to her job with seniority from original hire date and a wage rate that gives you credit for having worked from that time to the present.

(6). That plaintiff be awarded back pay starting on January 21, 2010 and ending on the day of trial calculated as follows: $90,000 per year (this includes overtime and holiday pay that Plaintiff habitually worked).

(7). That plaintiff be awarded pay increases including yearly equivalent raises, bonuses and benefits, investments in company and stock contributions.

(8). That plaintiff be awarded not only yearly pay increases but that she receive a pay increase from the C pay scale she was receiving to the pay scale B she was working towards with training on other pieces of equipment or in other departments of the mine.

(9). From her lost wages the following amounts should be deducted Pursuant to her duty to mitigate her damages: No earnings for 2010 or 2011; In 2012 earnings of $22,105.00 and approximately this much for each year thereafter.

(10). That plaintiff be awarded future lost wages extended until the jury determines that plaintiff could have through her own efforts replaced this income.

(11).  Any other relief this Court deems just and equitable.

31

DATED this 23 day of May, 2013.


/s/ Loren M. Lambert
Loren M. Lambert
Attorney for Plaintiff